## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**ALVINA T. BURBANK, individually, and on behalf of the
Estate of Imogene Bahe Burbank, JERALINE BAHE,
ALVIS A. BURBANK, and IVAN A. BURBANK,**

        **Plaintiffs,**

    **vs.**

**SAN JUAN REGIONAL MEDICAL CENTER and
BARBARA FOWLER, R.N.,**

        **Defendants.**

### COMPLAINT FOR WRONGFUL DEATH

Plaintiffs, through legal counsel, Barber & Borg, LLC (Scott E. Borg), state the following as their complaint against the defendants:

### PARTIES

1. Plaintiff, Alvina T. Burbank, is a resident of San Tan Valley, Pinal County, Arizona and serves in this wrongful death action in the capacity of personal representative for the Estate of Imogene Bahe Burbank, and, as the daughter of decedent, a wrongful death beneficiary.

2. Plaintiff Jeraline Bahe, is the daughter of decedent.

3. Plaintiff Alvis A. Burbank, is the son of decedent.

4. Plaintiff Ivan A. Burbank, is the son of decedent.

5. At the time of her death, decedent Imogene Bahe Burbank, was a member of the Navajo Nation, and resided in Chinle, Arizona.

6. Defendant San Juan Regional Medical Center (SJRMC) is a New Mexico corporation whose primary place of business is in Farmington, New Mexico.   Upon

1

information and belief, and at the times relevant to this complaint, SJRMC was legally responsible for the actions of those of its actual and/or apparent agents and employees who provided services to Ms. Burbank while she was a patient there, including registered nurse Barbara Fowler, Mark Bevan, M.D., and the other staff members who ostensibly cared for Ms. Burbank.

7.     Upon information and belief, Barbara Fowler, R.N., was at all material times employed by SJRMC and was acting for, on behalf of, and in furtherance of, the interests of SJRMC.  Upon information and belief, Barbara Fowler was at all material times a resident of San Juan County, New Mexico.

## JURISDICTION AND VENUE

8.     The district court has jurisdiction over the parties and the subject matter. The defendants are citizens of New Mexico. Plaintiff is a citizen of Arizona. Diversity jurisdiction exists pursuant to 28 U.S. Code § 1332. The matter in controversy exceeds, exclusive of interest and costs, the sum of seventy-five thousand dollars.

9.     Venue is proper in this district court.

## BACKGROUND AVERMENTS

10.     On or about April 30, 2013, Imogene Bahe Burbank was admitted to SJRMC with hypotension and apparent sepsis.

11.     On or about May 1, 2013, Ms. Burbank underwent a laparoscopic cholecystectomy, i.e., removal of her gall bladder, using a scope inserted into the abdomen. The surgery was uneventful.   She remained hospitalized and was satisfactorily recovering from the surgery.

12.     On or about May 5, 2013, Ms. Burbank requested permission to remove her electronic monitoring equipment in order to take a shower.  Dr. Mark Bevan gave permission for the shower.

13.     At approximately 17:27 to 17:35 (5:27 p.m. to 5:35 p.m.), defendant Barbara Fowler was changing the linens on Ms. Burbank's bed while Ms. Burbank was removing her clothes in the bathroom to take her shower.  Defendant Fowler indicated that she heard a "bump on the bathroom door" and found Ms. Burbank lying on the floor up against the door.  Ms. Burbank indicated to defendant Fowler that she ". . . was bending over and fell up against the door . . . [and] hit my head."

14.     Defendant Fowler breached the duty of reasonable care owed to Ms. Burbank and failed to measure up to the applicable standards of care, skill, and practice required of members of her professions, to wit:

    a.     Defendant Barbara Fowler should not have left Ms. Burbank unattended in the bathroom.

    b.     Defendant Barbara Fowler should have assisted Ms. Burbank in the bathroom to remove her foot wear and clothing prior to taking a shower.

    c.     Defendant Barbara Fowler should have assisted Ms. Burbank into the shower area of the bathroom.

    d.     Defendant Barbara Fowler should have provided Ms. Burbank with a shower chair while in the shower.

    e.     Defendant Barbara Fowler should have instructed Ms. Burbank to use the nurse call cord while in the bathroom and during her shower for assistance.

    f.     Adhering to these simple nursing acts would have ensured Ms. Burbank's safety while in the bathroom and would have prevented her fall and subsequent injuries and death.

15.    Defendant Fowler indicated that Ms. Burbank's vital signs were stable; however, the medical record do not reflect that any vital signs were taken by defendant Fowler.  Vital signs were noted, however, by CNA Cathlene Kilpatrick at 17:39 (5:39 p.m.) and then recorded again at 17:40 (5:40 p.m.).

16.    Defendant Fowler did not perform a neurological assessment on Ms. Burbank after Ms. Burbank's fall.  Further, performing a neurological assessment on a patient does not require a physician's order.

17.    Within ten minutes, defendant Fowler noted a ". . . new swelling.  Diameter of a golf ball was noted to the upper left posterior side of patient's head."  Ms. Burbank stated to defendant Fowler "that's where I hit the door."

18.    Despite the appearance of a golf ball size bump on Ms. Burbank's head, defendant Fowler still did not perform any neurological assessment on Ms. Burbank.

19.    Nursing notes and physician orders in the medical record indicate that Dr. Mark Bevan ordered a CT of the head without contrast.  It is unclear in the nursing notes what time Dr. Bevan made this order, but the physician orders do indicate that defendant Fowler read Dr. Bevan's telephone order at 17:05 (5:05 p.m.) on May 5, 2013, and she then entered the head CT order in to the system at 17:10 (5:10 p.m.) that same day.  The timing of this order, as it is documented in defendant Fowler's *nursing note*, is approximately 22 minutes ***prior*** to Ms. Burbank's fall.

20.    Defendant Fowler indicates that after the fall, and after the appearance of the golf sized bump on Ms. Burbank's head, the nursing assistant gave Ms. Burbank a chair bath and assisted her into bed.

21.    At 18:00 (6:00 p.m.), Ms. Burbank was sitting up on the edge of her bed eating dinner.

22.    An addendum note to the nursing record, timed at 21:43 (9:43 p.m.), states that defendant Fowler indicated "around 18:30" (6:30 p.m.), that "...patient was lying down by then watching television and talking with family.  Patient was alert and oriented."  Defendant Fowler continued her note and stated: "Around 19:20 (7:20 p.m.), patient was lying on her back.  Becoming restless.  Rubbing her forehead.  When asked if she was okay and if she had a headache, Patient *mumbled* "no"."

23.    Ms. Burbank continued to become more restless, stating she was lying on her side when, in fact, she was lying on her back.  She was moving her legs back and forth without purpose while in bed, while she was rubbing her forehead.

24.    At an undocumented time, defendant Fowler notified Dr. Mark Bevan regarding Ms. Burbank's odd change in behavior.

25.    At an undocumented time, Dr. Bevan briefly saw Ms. Burbank and ordered neurological checks be performed.

26.    Defendant Fowler performed her first neurological check at "around 19:20" (7:20 p.m.), or approximately 1 hour and 53 minutes after the fall, and noted that Ms. Burbank's left pupil was "about 3-4 and barely reactive.  Right eye was 5-6 and sluggishly reactive."

27.    During Dr. Mark Bevan's brief visit with Ms. Burbank, defendant Fowler told him the CT scan had not been completed.  At 22:45 (10:45 p.m.), Dr. Bevan ordered "CT head now."  The nursing notes indicate that Ms. Burbank was transported

to radiology for a head CT scan at 22:47 (10:47 p.m.), approximately 5 hours and 37 minutes after the original order was written.

28.     During the transport to radiology, Ms. Burbank became unresponsive, did not open her eyes, and started to vomit.

29.     Upon Ms. Burbank's return from radiology, she became obtunded, with unequal pupils.   The CT scan demonstrated a 1.5 cm left hemispheric subdural hemorrhage with a 1.5 cm left-to-right midline shift.

30.     The on-call neurosurgeon was contacted and was unavailable. The backup neurosurgeon was called in.

31.     After surgery, Ms. Burbank continued to have neurosurgical bleeding.  Ms. Burbank never improved and died on May 7, 2013.

## NEGLIGENCE

32.     Paragraphs 1-30 above are hereby incorporated by reference.

33.     At all times material hereto, defendant Fowler was the assigned registered nurse and the primary, ancillary caregiver to Ms. Burbank during the day shift on May 5, 2013.

34.     Defendant Fowler had a duty to provide competent and reasonable nursing care by providing supervision to Ms. Burbank, a high fall risk patient, while preparing for, and attempting to, take a shower.

35.     Defendant Fowler had a duty to provide competent and reasonable nursing care by properly assessing and re-assessing Ms. Burbank and to implement and engage in nursing practices and duties in order to appropriately monitor Ms. Burbank after her head injury.

36.     Defendant Fowler mishandled the head injury, which was in fact a brain injury. She failed to follow and apply appropriate standards of nursing care, leading up to the death of Ms. Burbank.

37.     In addition, defendant Fowler's care was negligent in the following ways, at a minimum:

a.     By failing to perform a timely, appropriate, and necessary neurological assessment for a patient who has suffered head trauma.

b.     By her failing to perform follow-up neurological assessments on Ms. Burbank immediately every 15 minutes after Ms. Burbank's fall during the first hour, and every 30 minutes during the second hour forward until Ms. Burbank could be fully assessed by a physician.

c.     By having or permitting a nursing assistant to give Ms. Burbank a chair bath after the fall instead of having Ms. Burbank lay down and remain in a darkened, sedentary environment until she was neurologically cleared.

d.     By permitting Ms. Burbank, only one half hour after hitting her head, to be sitting up on the edge of the bed eating and interacting with family members instead of having Ms. Burbank lay down and remain in a darkened, sedentary environment until she was neurologically cleared.

e.     By her failure to document the medical record appropriately.

f.     By her failure to timely advocate for Ms. Burbank when the wait for the ordered CT scan was greater than a 5 hour delay.

g.     By her failure to be cognizant in a timely manner of Ms. Burbank's laboratory results that were available to defendant Fowler on the morning of May 5,

2013, at 06:07 a.m.  These lab tests indicated that Ms. Burbank's red blood cell count, her hemoglobin, and her hematocrit were all low, indicating that Ms. Burbank had bleeding and/or clotting problems.

       h.    By her failure to be cognizant of Ms. Burbank's documented swelling and numbness of both legs prior to the fall, thereby placing Ms. Burbank at higher risk for falling.

       i.    By her failure to assist Ms. Burbank to remove her footwear, by failing to escort Ms. Burbank to the shower, and by not providing a shower chair.

       j.    By her failure to be aware that Ms. Burbank was on peritoneal dialysis, not hemodialysis, and, therefore Ms. Burbank's abnormal coagulation studies would not be due to hemodialysis, but probably some other bleeding and/or clotting problem.

       k.    By her failure to be take into proper account that Ms. Burbank had bleeding difficulties the day before her fall.

       38.    Defendant Fowler departed from her duty to assess and re-assess Ms. Burbank and failed to exercise the degree of skill, care, and knowledge expected of a reasonably prudent healthcare provider belonging to her profession within the State of New Mexico in the same or similar circumstances.  In doing so, defendant Fowler was negligent.

       39.    As a direct and proximate result of the defendant Fowler's negligence, Ms. Burbank suffered a subdural hemorrhage; and a timely diagnosis of the hemorrhage was negligently delayed, resulting in Ms. Burbank's  untimely death.

40.     Because Ms. Burbank was not given timely neurological assessments after her fall, her condition was allowed to deteriorated until she became unresponsive and then died.

41.     Defendant Fowler was on the job and acting within the scope of her duties as an employee at SJRMC at the time Ms. Burbank was under her care.

42.     Defendant SJRMC and defendant Fowler are liable for the wrongful death of Ms. Burbank and for all other damages arising from their negligent handling of Ms. Burbank's medical condition, including pre-death damages, such as pain and suffering, together with loss of consortium damages.

43.     SJRMC is legally responsible for the negligent actions of its staff, including employees of SJRMC, while those employees are performing job duties for the employer or engaged in furtherance of the interests of the employer.

44.     The involved staff, including but not limited to, defendant Fowler and Mark Bevan, M.D., were employees of defendant SJRMC at the time of Ms. Burbank's hospitalization, fall, and subsequent death.

45.     Defendant SJRMC is vicariously liable for the actions of its employees.

46.     At all times material hereto, SJRMC and its employees were acting with the actual or apparent authority of defendant, San Juan Regional Medical Center, which is therefore liable for their negligent acts and omissions resulting in injury and death of Ms. Burbank.

## DAMAGES

47.     The Estate of Imogene Bahe Burbank incurred reasonable and necessary expense for her medical treatment, as well as funeral and burial expenses.  Therefore,

the estate of Imogene Bahe Burbank is entitled to recover these special damages in an amount to be determined at trial.

48.     All other damages authorized by New Mexico for wrongful death, including all damages statutorily recognized and authorized by New Mexico law, including the Wrongful Death Act, §41-2-1, et seq., NMSA 1978.   The Estate of Imogene Bahe Burbank has lost the present value of the life of decedent, including her enjoyment of life.   The Estate's damages include damages for the value of the loss of life itself, pain and suffering, as well as economic damages, including loss of household services and non-medical expense.   The damages recoverable are more fully set forth in the Uniform Jury Instructions, No. 18-1830.   Therefore, the estate of Imogene Bahe Burbank is entitled to recover damages in an amount to be determined at the trial of this cause.

49.     Because of defendants' negligence, Imogene Bahe Burbank's children suffered loss of consortium, including loss of love, affection, companionship, and guidance arising from the wrongful death of Imogene Bahe Burbank.

**WHEREFORE,** plaintiffs pray:

50.     For judgment against defendants in an amount determined by a jury to be sufficient to compensate plaintiffs for the pre-death damages, including pain and suffering, experienced by Imogene Bahe Burbank as a result of the defendants' negligence;

51.     For judgment against defendants in an amount determined by a jury to be sufficient to compensate the estate of Imogene Bahe Burbank under the Wrongful Death Act for all the damages suffered because of Imogene Bahe Burbank's wrongful death;

52.     For judgment against defendants for loss of consortium;

53.     For judgment against defendant SJRMC for all of the foregoing damages, and any other relief to which plaintiffs are entitled under the statute;

54.     For plaintiffs' costs of suit;

55.     For any applicable interest, including pre-judgment interest; and,

56.     For such other and further relief as the court might find proper under the circumstances of this litigation.

> Respectfully submitted,
>
> BARBER & BORG, LLC
> /s/ Scott E. Borg, Esq.
> P.O. Box 30745
> 3816 Carlisle Blvd. NE, Suite C (87107)
> Albuquerque, NM  87190-0745
> (505) 884-0004
> scott@barberborg.com
>
> ATTORNEY FOR THE PLAINTIFFS